UNITED STATES DISTRICT COURT IN AND FOR
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-mj-8437-DLB

Presidential Affairs Department:
Sector of Scientific Centers &
Presidential Camel Department,
Dubai Equine, and Dubai Camel

       Petitioners,

v.

United States of America,

       Respondent.

_____/

## REPLY IN FURTHER SUPPORT OF RULE 41(G) MOTION FOR RETURN OF PROPERTY

The government's Response in Opposition to Petitioners' Motion for Return of Drugs ("Opposition") spends a considerable amount of time dissecting the exhibits attached to Presidential Affairs Department: Sector of Scientific Centers & Presidential Camel Department, Dubai Equine, and Dubai Camel's (collectively "Petitioners'") Rule 41g Motion for Return of Property ("Motion") and questioning

Petitioners' relationship with Dr. Fishman[1].  With all due respect, the government's Opposition misses the point.  The Opposition fails to provide a valid reason why the government should be permitted to trample on Petitioners' rights and/or why Petitioners' should not receive their property.

## I.   Petitioners' have made more than a threshold showing that they own the property requested.

The government here is well aware that, at least, some of the property illegally seized from Dr. Fishman belonged to Petitioners.  First, Petitioners' Motion attached a letter on United Arab Emirates Presidential letterhead, executed and with a Presidential seal detailing Petitioners' relationship with Dr. Fishman and attaching an inventory of requested property.  The letter clearly establishes ownership of the property seized by the government.   While the letter is not "certified," which presumably means notarized, and/or sworn, it is written on Presidential letterhead and attaches a special seal denoting the office of Presidential Affairs.   In most places, the Presidential seal is much more official and valuable than a notary stamp.  Moreover, the world is in the middle of a pandemic.  Governments all over the world have ordered citizens to shelter in and only leave home for essential travel.  The pandemic has not escaped United Arab Emirates ("UAE").  Since March 26, 2020,

---

[1] The government's arguments are completely inconsistent with its knowledge of the relationship and statements made in litigation to the court in *United States v. Seth Fishman*, Case No.19 Mag 10120 (S.D.N.Y), which will be fully addressed *supra*.

the UAE has imposed restrictions on travel, curfews in order to disinfect the cities, termination of public transportation, and imposed other measures to protect citizens of UAE from COVID19.   *See*   https://www.aljazeera.com/news/2020/03/uae-imposes-curfew-deep-cleaning-coronavirus-cases-rise-200326192938826.html.

Due to these restrictions, securing a notarized letter and remitting it to the United States is not an easy task.  Moreover, things are further complicated because notaries are not used in the ordinary course in UAE.  Instead, the Presidential seal is well respected and accepted to "certify" any document.

To further support Petitioners' claim, and in direct response to the government's response, attached hereto as Composite Exhibit 1 are invoices Petitioners' were able to locate that reflect product purchased from Dr. Fishman. This product was purchased and Petitioners' were awaiting shipment when the property was illegally seized by the government.  These are just a sample of invoices for product requested.  Petitioners and Dr. Fishman have had a business relationship for years.  Petitioners always requested product in advance of the breeding season. Dr. Fishman created the product and sold it to Petitioners.

Finally, the government's attempts to cast doubt on Petitioners' interest in the seized property is belied by the extensive litigation in *United States v. Seth Fishman* related to Dr. Fishman's attempts to travel to UAE to continue to work with Petitioners.  Specifically, as early as December 2019, the government was well

3

aware that Dr. Fishman worked closely with Presidential Camels and was named Chief Research Officer.  *See United States v. Fishman*, Case No. 19-mg-10120 (S.D.N.Y.), Motion to Travel attached hereto as Exhibit 2.  The government was well informed that Dr. Fishman's work included creating product for the camel industry and camel breeding.  *See id.*  The motion to travel also included a letter from Bengawi A.A., Head of Services and Follow Up Section explaining Dr. Fishman's role in these projects.  *See id* at 16.  Bengawi A.A. also signed the letter attached as Exhibit 3 to Petitioner's Rule 41g Motion seeking return of its product. In response to Dr. Fishman's motion to travel, the government made clear to the court that it was aware that Dr. Fishman sold product to overseas, including to the UAE.  *See United States v. Fishman*, 19-mg-10120 (S.D.N.Y.), Government Response to Motion to Travel at 3, attached hereto as Exhibit 3.

Given all the indicia of ownership presented by Petitioners coupled with the government's knowledge of the relationship, and all the information in the government's possession that was likely seized from Dr. Fishman establishing the relationship and the sales of the property at issue, there is no question that Petitioners' have established a possessory interest in the property and that the government cannot dispute such ownership.

## II.     The property requested is not contraband.

The government's opposition goes to great lengths to detail the allegations against Dr. Fishman and others.  However, these allegations all relate to conduct in the United States and specifically relate to horse racing.  The product sought here is for use overseas and for camels.  It is well established that it is not illegal to export unapproved new animal drugs to another country if they meet the foreign purchasers' specifications and the drug is not unlawful to possess or use in that country.  This is black letter law in the FDA veterinary world.  *See* 21 USC 381(e). Petitioners attached as Exhibit 2 to its Motion makes clear that the product sold to Petitioners meets the specification of Section 381(e).  As such, the government cannot rely on claims that the produce sought is "contraband" in order to continue to deprive Petitioners' of its property.

Moreover, the government does not require the product sought here as evidence in the case of *United States v. Navarro* because that case involves horse racing and has nothing to do with camels.

Finally, the government boldly refers to public policy and the need to protect the health of the people and animals as a reason for not releasing the property that belongs to Petitioners.  Property that Petitioners' are requesting.  Property that Petitioners' regularly use in the course of their treatment of camels.  Again, with all due respect, the United States Attorney's Office Southern District of New York and

the United States Attorney's Office in the Southern District of Florida are not tasked or responsible for maintaining the safety of camels owned by Presidential Affairs in UAE.  That is a concern squarely in the purview of Presidential Affairs and UAE.

### III.   The Government's Response Fails to Address the Illegal Search and Seizure of Petitioner's Goods.

It is well established that a warrant seeking all property of a certain category, rather than only property for which there is probable cause, violates the Fourth Amendment's particularity requirement and is essentially a general warrant.  *See United States v. Cook*, 657 F.2d 730, 733-34 (5th Cir. 1981) (holding that "cassettes onto which … copyrighted films … have been electronically transferred" was insufficient where place to be searched had many other cassettes, and warrant "supplied searching agents with little guidance"); *United States v. Fuccillo*, 808 F.2d 173, 175-78 (1st Cir. 1987) (warrants to search distributor, warehouse, and retail clothing store for "cartons of women's clothing" had insufficient description, because there was no explanation for executing agents to differentiate stolen clothing from other goods).

The Warrant here clearly runs afoul of these limits.  The Warrant failed to provide any guidance whatsoever to the searching agents in determining what to seize, and failed to set forth with any specificity what records or products the government had probable cause to seize, on suspicion of being related to unapproved and/or misbranded drugs.  *See Cook*, 657 F.2d at 733-34.  The Warrant allowed the

government to seize "any … drugs," a generalized description that encompassed all drugs, even those that are perfectly lawful.  As such, the warrant on its face permitted the government to illegally seize everything at the warehouse, including items which were entirely lawful.  And even when the warrant was more specific, it still called for the agents to seize "any misbranded, adulterated or unapproved drugs" or "any …pharmaceutical ingredients and products."  These impermissible catch-all phrases allowed the agents unfettered discretion.  *See e.g., United States v. Morris*, 977 F.2d 677, 682 (1st Cir. 1992) ("the catch-all phrase authorizing seizure of 'any other object in violation of the law' is impermissibly broad").  The Warrant here was too broad, it lacked the requisite particularity, rendering it an unconstitutional general warrant.

Particularly, the evidence seized here was to be used to support the Government's case in *United States v. Navarro et al*., 20 Cr. 160 (MKV) (S.D.N.Y.).  By the government's own admissions, this case squarely involves product supplied to racehorse trainers in the United States.  *See* Opposition at 3.  However, the agents seized ALL the product at Dr. Fishman's warehouse, including product to be used for export for camels.  The agents should not have seized the product requested here because it would not have met a narrowly tailored request for product that supports the government's case in *Navarro*.  As such, the warrant ran afoul of general limits

under the Fourth Amendment and that is a enough basis to return Petitioners' property.

## IV.    The Government's notice and timeliness arguments are disingenuous.

The government's claim that Petitioners' never requested their property and waited until the Indictment in *United States v. Navarro* to file Motion is disingenuous.  Shortly after the arrest of Dr. Fishman and contemporaneous seizure of the product requested here, Dr. Fishman informed agents that products in his warehouse was prepared for export to UAE.  *See* Declaration of Andrew Feldman, counsel for Dr. Fishman, attached hereto as Exhibit 4.   On November 15, 2019, Mr. Feldman requested an inventory of product seized in order to assess what product was meant for export.  See id.  After receipt of the inventories, Mr. Feldman notified the government that the product was meant for export, demanded return of the property, and notified that a Rule 41g motion would be forthcoming if product not returned.  *See id.*  Mr. Feldman and the government continued to have discussions regarding the inventory and Dr. Fishman's case through February 2020.  When it became clear the government would not return the property to Dr. Fishman in order for him to remit to Petitioners, Petitioners filed its Motion.

## V.    Petitioner's have established irreparable harm.

A refund for the product purchased will not repair the harm caused by the government's improper seizure.  The animal drugs seized were tailor-made by Dr.

Fishman to the specifications of Petitioners' animals and cannot be created or obtained elsewhere. Petitioners, and their animals, will suffer irreparable harm if the items seized are not returned to them immediately. This is a harm that cannot be remedied in a monetary way as the animal drugs are customized and unique.

Dr. Fishman is the only veterinarian with enough knowledge, historical experience, and expertise with the Petitioners' animals to create the product required. Money will not buy more product. The product is required to breed more camels. The product spurs mating, similar to the invitro process. It is important the product be returned, so Petitioners' can capitalize on the breeding season[2].

Moreover, it is no secret that camel racing is a multimillion-dollar industry in UAE. A camel can be sold for upwards of $9.5 million. *See* https://www.cnn.com/2017/03/14/sport/camel-racing-robots-uae-thoroughbred-hussain-al-marzooqi/index.html. And it is no secret that camels are treated exceptionally well, especially to camels belonging to the Presidential Affairs. These camels have trainers, have special diets, take special animal drugs, and have special veterinarians, such as Dr. Fishman, caring for their every need. *See id.* Therefore,

---

[2] Government's opposition claims that its claim for the product is "spurious" because the breeding season has come and gone. Opposition at 12. Again, the government misses the point. The camels are breed yearly and "peak" breeding is in months January to March. However, that doesn't mean camels are not breed at other times of the year. Moreover, it doesn't mean that Petitioners' do not want to catch up on breeding missed January to March.

missing one breeding season can have long lasting impact on Petitioners' fleet of camel.

## CONCLUSION

For the foregoing reasons, the Court should exercise equitable jurisdiction over Petitioners' Motion, and schedule an expedited hearing on any factual issues in dispute, and order the government to return the property, with any conditions the Court deems necessary.  If the Court is inclined to hold a hearing, a representative from Presidential Affairs can be available by phone or video conference with the assistance of an interpreter.

Dated: April 16, 2020

Respectfully submitted,

TACHE, BRONIS, CHRISTIANSON AND
DESCALZO, P.A.
150 S.E. 2 Avenue, Suite 600
Miami, Florida 33131
Telephone:  (305) 537-9565
Facsimile:   (305) 537-9567

By: */s/ Marissel Descalzo*
    Marissel Descalzo, Esq.
    Florida Bar No. 669318
    mdescalzo@tachebronis.com
    service@tachebronis.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing was filed with the Clerk of Courts

and served on all counsel of record by electronic correspondence.

By: <u>*/s/ Marissel Descalzo*</u>
                Marissel Descalzo, Esq.

COMPOSITE EXHIBIT 1



2565 S. Ocean Blvd.
Highland Beach, FL  33487
5612709286
sethfishman@hotmail.com

**ADDRESS**
Wisdom
H.H. Sheikh Tahnoun Bin Zayed
Al Nahyan
AL REEF STABLES
Khaleej Al Arabi Street
 Abu Dhabi UAE

## Proforma Invoice 1031

**DATE** 05/17/2019

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **AC 3**<br>AC 3 | 150 | 25.00 | 3,750.00 |
| **AC 5**<br>AC 5 (New Name Pending) | 150 | 25.00 | 3,750.00 |
| **AC 10**<br>AC 10 | 100 | 20.00 | 2,000.00 |
| **AC3G15**<br>AC3G15 | 150 | 30.00 | 4,500.00 |
| **Phen3**<br>Phen3 | 150 | 25.00 | 3,750.00 |
| **MyoGen**<br>MyoGen post event therapy | 100 | 47.50 | 4,750.00 |
| **EGH10**<br>DHEA 30 MG/ML   10 ML VIAL | 200 | 21.00 | 4,200.00 |
| **Oral PDP**<br>Oral PDP 50 ml vial | 2 | 100.00 | 200.00 |
| **PDP**<br>PDP Injectable | 12 | 45.00 | 540.00 |
| **PDP ER**<br>PDP Extended Release | 1 | 85.00 | 85.00 |
| **NPX Oral**<br>NPX Oral (Nutrient Protein Extract) | 1 | 250.00 | 250.00 |

Wire Information:
Seth Fishman DVM
Account: 9139136525
Swift: CITI US 33
Bank Address:  4055 North Federal Hwy
                        Boca Raton FL 33431

| TOTAL | $27,775.00 |
|-------|-----------|

Accepted By                                    Accepted Date



2565 S. Ocean Blvd.
Highland Beach, FL  33487
5612709286
sethfishman@hotmail.com

**BILL TO**
PRESIDENTIAL CAMELS AND
CAMEL RACING AFFAIRS
CENTER
PO Box 17292
 AL AIN UAE

## INVOICE 2504

**DATE** 04/29/2019   **TERMS** Due on receipt

**DUE DATE** 04/29/2019

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **ITP PLUS**<br>ITP PLUS:  IDM | 600 | 75.00 | 45,000.00 |
| **Equi-Ace**<br>Equi-Ace | 750 | 95.00 | 71,250.00 |
| **NCIS:HP Bleeder 10**<br>HP BLEEDER 10 ML VIAL | 150 | 40.00 | 6,000.00 |
| **Shipping**<br>Shipping | 1 | 2,500.00 | 2,500.00 |
| **Good Customer:Trainer's**<br>Trainer's Discount | 1 | -68.00 | -68.00 |

| | |
|---|---|
| PAYMENT | 124,614.00 |
| **TOTAL DUE** | **$68.00** |

EXHIBIT 2

 FELDMAN

Andrew S. Feldman
Feldman Firm, PLLC
Southeast Financial Center
200 S. Biscayne Blvd, Suite 2770
Miami, Florida 33131
Phone: 305.714.9474
Mobile: 202.320.7705
Facsimile: 305.714.9555
Email: afeldman@feldmanpllc.com
Website: www.feldmanpllc.com

December 4, 2019

**VIA EMAIL ONLY**

Re:     *United States v. Seth Fishman, 19-mag-10120 (S.D.N.Y.)(UNDER SEAL)*
**MOTION TO TRAVEL TO UNITED ARAB EMIRATES AND REQUEST FOR
EXPEDITED RULING**

Dear Judge Parker:

Dr. Seth Fishman is at liberty on a $100,000.00 personal surety bond co-signed by his elderly father and collateralized by real property. As a condition of his release, he surrendered his U.S. Passport and executed a confession of judgment for a property owned by Dr. Fishman in Palm Beach County in favor of the United States.

Dr. Fishman is an internationally renowned veterinarian whose practice focuses largely on international patients and international clients, most specifically in the United Arab Emirates (UAE). It has taken Dr. Fishman years to obtain these valuable relationships. Although Dr. Fishman has select customers and clients in the United States, the vast majority of his work is performed abroad.

Dr. Fishman intends to travel to the United Arab Emirates (UAE) on December 13, 2019 and to return to New York to seek follow up treatment with Dr. Tuttle at Sloan Kettering Hospital in New York on January 13, 2020. *See* **Exhibit A.**[1] The enclosed documents show the precise times, dates, and locations that Dr. Fishman intends to travel and the dates he would be in the UAE. This trip will require Dr. Fishman to gain temporary possession of his U.S. passport to travel.

Accordingly, Dr. Fishman requests that he permitted to pick up his U.S. Passport from his pre-trial services officer on December 13, 2019 and return the passport on January 9, 2020 within 24 hours of his return from UAE to his pre-trial services office in New York.

The purpose of his travel is business-related. As set forth in the attached letter, **Exhibit B,** Dr. Fishman as the Chief Research Officer for Presidential Camels in involved in numerous projects involving the camel industry and camel breeding.

---

[1] As shown, Dr. Fishman originally booked travel for December 13, 2019 through April of next year but has now booked an earlier return flight from the UAE on January 9, 2020.

Honorable Katharine H. Parker
December 4, 2019
Page 2

Other projects involve Dubai Camel Hospital which is a public camel hospital that services the dairy and beef industry (camel milk). Traditionally, camels have been treated with bovine or equine specific products. Dr. Fishman is working with the MOH (Ministry of Health) and other UAE departments to design camel specific medications.

Dr. Fishman's recent arrest and the seizure of his product from Equestology in Palm Beach County has frustrated these relationships and/or his ability to continue treating animals and/or working on important projects abroad. Indeed, if Dr. Fishman is not permitted to travel for this limited period of time, there is a risk his employers may terminate his agreement.

Furthermore, the Government's allegations in the criminal complaint in no way relate to Dr. Fishman's overseas business and/or treatment of animals abroad and/or in the UAE. In fact, Dr. Fishman's exportation of products animal drugs for use abroad and/or for foreign purchasers is *entirely legal*. *See* 21 U.S.C. Section 381(e) (affirming that animal drugs which are unapproved in the United States which are intended for export to foreign countries *shall* not be considered misbranded or adulterated under the Food Drug and Cosmetics Act).

Defendants, in more egregious cases alleging tax evasion, fraud, and drug trafficking have been permitted to travel internationally while they are facing trial and in several of those cases the courts have permitted similar protocols for international travel. *United States v. Veldora Arthur*, No. 10-CR-20753-SEITZ (S.D. Fla. 2010) (ECF-109 and ECF 141) (granting motion to travel to Bahamas and to Charlotte, NC and separate motion to travel to Niagara Falls, Canada for 2 weeks pending trial in multi-count fraud case); *United States v. Francis Vieira*, No. 09-CR-00045-SRC (D. N.J. 2009) (ECF-111, ECF-265, and ECF 307) (granting motion to defendant, a resident of South Florida, to travel to Dublin Ireland, granting motion to travel to Ireland and London, England for extended periods of time pending trial and granting motion to travel to Toronto, Canada pending sentencing); *United States vs. Wesley Snipes*, 06-CR-00022-WTH-GRJ (M.D. Fla. 2006) (ECF-520) (granting an opposed motion to travel to Namibia, Africa for 3.5 weeks and to London, England for 2.5 months for work purposes pending trial in a federal criminal tax case); *United States v. Martha Brimberg*, No. 13-CR-20570- WILLIAMS (S.D. Fla. 2013) (ECF-36) (permitting travel to Cuba for defendant pending sentencing on a possession with intent to distribute cocaine offense).

There is no risk whatsoever that Dr. Fishman would flee (or remain) in the UAE if he were permitted to travel there for a business trip. Dr. Fishman is not a risk of flight, has never been arrested anywhere in the world prior to his arrest in this case, has significant ties to this community, has no significant assets outside of the United States, or family members in UAE or outside the U.S. which would enable him to flee. *Compare United States v. Pryce,* No. 04-CR-316S, 2005 WL 464945, at *4 (W.D.N.Y. Feb. 21, 2005)

Honorable Katharine H. Parker
December 4, 2019
Page 3

(Skretny, J.) (foreign citizen with extensive ties to home country, including a child who still lived there, was a flight risk)

Instead, Dr. Fishman's father, mother, and sisters live in New York with whom he is very close. Dr. Fishman does not plan to flee and abandon his family during a business trip. Dr. Fishman does not plan to abandon his father given his father's age and health.

Why? First, among other things, based on the violations listed in the Criminal Complaint, at worst, Dr. Fishman is subject to a 3-year statutory maximum penalty for misbranding with the intent to defraud. Second, Dr. Fishman would not risk more serious penalties, abandon his family, and subject his elderly father who is a co-signer on the bond to a judgment in favor of the United States. *United States v Esposito,* 309 F. Supp. 3d 24, 32 (S.D.N.Y. 2018) ("To be sure, the risk of flight here is mitigated by Esposito's significant family ties and the fact that he has offered his family home, in which his elderly mother lives, as a security on his personal recognizance bond."). Third, Dr. Fishman would not foolishly risk forfeiture of his home (which he owns free and clear) in Palm Beach County for which he has signed a Confession of Judgment in favor of the United States if he fled.

If the Court is still concerned with the prospect of flight and deems it necessary, Dr. Fishman is willing to deposit an additional 10% of his personal surety bond ($10,000.00) in the court registry as additional collateral to secure the bond.

The undersigned conferred with AUSA Sarah Mortazavi by teleconference on Monday December 2, 2019 and the Government opposes this Motion.

WHEREFORE, Dr. Fishman respectfully requests that your Honor issue and Order permitting Dr. Fishman to gain temporary possession of his U.S. Passport from pre-trial services on December 13, 2019 and to return that passport to his pre-trial services officer, on January 9, 2020 in New York within 24 hours of landing in New York from UAE.

Dr. Fishman agrees, if necessary, to also deposit $10,000.00 in the court registry as additional collateral for his bond which is already collateralized by real property in the amount of $100,000.00.

Honorable Katharine H. Parker
December 4, 2019
Page 4

Sincerely,

FELDMAN FIRM, PLLC

Andrew S. Feldman

**cc:**     AUSA Sarah Mortazavi

# EXHIBIT A

Home    Hello, SETH ▼     English ▼

 American Airlines    Plan Travel    Travel Information    AAdvantage    

# Your trip

« Show all trips

Check in beginning 24 hours and up to 45 minutes before your flight (90 minutes for international).

| Change trip | Cancel trip | Choose seats |

Record locator:  **JFMLLF**                        Issued: **Saturday, October 5, 2019**

Trip name:  **MIA/AUH**    Edit                Status:  **Ticketed**

**Depart** Miami, FL  **to**  Abu Dhabi, United Arab Emirates

Friday, December 13, 2019   to   Sunday, December 15, 2019

| Flight | Depart | Arrive | Travel time | Aircraft | Class | Seats |
|---|---|---|---|---|---|---|
| ✈ 6161 American Airlines<br>Operated by British Airways | 9:25 PM<br>MIA | 10:55 AM<br>LHR<br><br>Arrives December 14 | 8h 30m | 747 | Business | Choose seats |

Overnight flight or connection

Stop: London, United Kingdom (LHR)

6675 **American Airlines**
Operated by British Airways

1:15 PM
LHR

Departs December 14

12:10 AM
AUH

Arrives December 15

6h 55m

777

Business

Choose seats

Overnight flight or connection

---

## Return  Abu Dhabi, United Arab Emirates  to  Miami, FL

Saturday, April 4, 2020

| Flight | Depart | Arrive | Travel time | Aircraft | Class | Seats |
|---|---|---|---|---|---|---|
| 6684 **American Airlines** Operated by British Airways | 1:50 AM AUH | 6:30 AM LHR | 7h 40m | 777 | Business | Choose seats |
| Stop: London, United Kingdom (LHR) | | | | | | |
| 6160 **American Airlines** Operated by British Airways | 10:40 AM LHR | 3:00 PM MIA | 9h 20m | 747 | Business | Choose seats |

# Cost summary

| Your total | | |
|---|---|---|
| $ **4,594.45** | | |
| Includes all taxes and carrier-imposed fees | | |

| Passenger | $3,238.00 | Bag and optional fees |
| Taxes | $156.45 | Reservation and tickets FAQs |
| Carrier-imposed fees | $1,200.00 | Price and Tax Information |
| Subtotal | $4,594.45 | |

**AAdvantage® benefits**

| | | |
|---|---|---|
| Priority | | $0.00 |
| **Total** (all passengers) | | **$4,594.45** |

# Mileage Multiplier

## Earn extra miles, without extra travel.

SETH FISHMAN , you can multiply your AAdvantage miles for your upcoming flight.

Buy     10,000     miles for only     $324

[Multiply your miles](#)

This offer is non-refundable. Bonus miles are in addition to base miles earned and don't count toward elite status qualification. Your bank or credit card company may charge a foreign transaction fee; please contact your card issuer for details.

[Mileage Multiplier terms and conditions](#)

# Travel offers

 Save and earn miles on car rentals

[Search cars](#)

 Great rates on hotels

[Search hotels](#)

 Trip insurance protection

[See what's covered](#)

# Passengers

Seth   Fishman

93HY308 (AAdvantage)

[Add / edit passenger information](#)

Day-of-travel information

Add / edit information

# Helpful links

Email trip                          Send to calendar                    Reservation and tickets FAQs

Bag and optional fees               Print trip and receipt



# Earn up to a $200 statement credit
Plus, 40,000 bonus miles after qualifying purchases with this credit card offer

Learn more

## Help

Contact American

Receipts and refunds

FAQs

Agency reference

Cargo

Bag and optional fees

Customer service and contingency plans

Conditions of carriage

## About American

About us

Careers

Investor relations

Newsroom

Legal, privacy, copyright

Combating human trafficking

Browser compatibility

Web accessibility

## Extras

Business programs

Gift cards

American Airlines credit card

Trip insurance

CoBrowse





Link opens in new window. Site may not meet accessibility guidelines.





OFFICIAL PREMIER PARTNER

# Ticket & receipt



Ticket number: 176 2332393184
Scan the bar code or use the ticket number above at
the self check-in points in the airport.

| Passenger name | Emirates Skywards number | Issued by / Date |
|---|---|---|
| FISHMAN/ | EK270402580 | AGT 86491845 AE |
| SETHMR | | 30NOV2019EKWWWWW DUBAI / EMIRATES IBE |

**Your booking reference: FNRR3S**

Your ticket is stored in our booking system. This receipt is your record of your ticket and is part of your conditions of carriage.

For more information you can read the notices and conditions of contract (Opens a new window).

You might need to show this receipt to enter the airport or to prove your return or onwards travel to immigration. Check with your departure airport for restrictions on the carriage of liquids, aerosols and gels in hand baggage and check your visa requirements.

 Check in online, or  90 minutes  60 minutes  45 minutes

Check in at the airport. Arrive up to 3 hours before your flight and follow the signs to our check-in counters.

If you're checking in bags, go to our check-in counters at least 90 minutes before your flight.

Once you have checked in, go through security. You should do this at least 60 minutes before your flight.

Arrive at the boarding gate 45 minutes before departure. The gates close 20 minutes before the flight leaves.

## Your travel information

All times shown are local for each city

 **Departing » From Dubai, United Arab Emirates**

Leg **1 of 1** | Dubai  (DXB)  to New York John F Kennedy  (JFK)  | Operated by Emirates (equipment owner - Emirates)

| Flight | Check-in Opens | Departure | |
|---|---|---|---|
| **EK 203** | 08Jan2020 | 09Jan2020 | **DUBAI** |
| Business | **23:35** | **02:35** | Departing DXB, Dubai International Airport |
| Flex Plus | | | Terminal 3 |
| | | | |
| Seat | Status | Arrival | **NEW YORK** |
| | Confirmed | 09Jan2020 | Arriving JFK, John F Kennedy International Airport |
| | | **08:15** | Terminal 4 |

 Baggage 2Piece



**Baggage allowance**

Enjoy discounted rates when you purchase extra baggage online.



**Emirates Skywards**

Earn Miles on every flight and enjoy a world of benefits.



**Dining**

Explore the world in every bite of our regionally inspired meals.



**Young flyers**

Kids get top flight treatment with packs, special meals and more.

© Emirates. All rights reserved   Emirates Experience | Check-in Online | Manage a Booking | Baggage | Contact us



OFFICIAL PREMIER PARTNER

Ticket number: 176 2332393184
Scan the bar code or use the ticket number above at
the self check-in points in the airport.

## Fare information

| Fare | Equivalent fare | Taxes / Fees / Charges (TFC) | Total fare (Incl. TFC) | Form of payment |
|---|---|---|---|---|
| NOFARE | - | AED75-AE AED5-TP AED5-ZR<br>AED35-F6 AED70-US AED20-XA<br>AED30-XY AED30-YC AED1680-YQ | AED1950 | CREDIT CARD |

**Fare calculation**
DXB EK NYC OOWFM00 TOTAL MILES 100000 END

**Additional information**
FQTR EK270402580 NON END/SKYWARDS FLEX PLUS REWARD/NOT FOR SALE

## Baggage allowance

| Passenger type | Route | Baggage allowance |
|---|---|---|
| ADULT | EK DXBJFK 2PC | BAG 1 - NO FEE UPTO70LB/32KG AND MAX59IN/150CM<br>BAG 2 - NO FEE UPTO70LB/32KG AND MAX59IN/150CM VIEWTRIP.TRAVELPORT.COM/BAGGAGEPOLICY/EK |

| Passenger type | Route | Carry on baggage |
|---|---|---|
| ADULT | EK DXBJFK 2PC | BAG 1 - NO FEE UPTO15LB/7KG AND UPTO45LI/115CM<br>BAG 2 - NO FEE UPTO15LB/7KG AND UPTO45LI/115CM |

| Passenger type | Route | Embargo |
|---|---|---|
| ADULT | EK DXBJFK | VIEWTRIP.TRAVELPORT.COM/BAGGAGEPOLICY/EK |

If you go over the baggage allowance you may be charged. If you purchase extra baggage on emirates.com, you could get a discount. Alternatively you can pay for any extra baggage charges at check-in. For more information please visit our baggage section.

## Hazardous materials notification

The carriage of certain hazardous materials like aerosols, fireworks and inflammable liquids aboard the aircraft is forbidden. If you do not understand this restriction, further information may be obtained from your airline.

With immediate effect, personal motorised vehicles such as hoverboards, mini-Segways and smart or self-balancing wheels, are forbidden on our flights as they contain large lithium batteries. For safety reasons, we can't accept these as part of checked-in baggage or as hand luggage.

In light of advisories from various aviation regulatory bodies and concerns raised by Samsung about its Galaxy Note 7 smartphones, passengers are advised that these devices are prohibited on all Emirates flights. Passengers are requested not to bring them on board Emirates' flights in person, as well as in carry-on or checked-in baggage.

## Emirates cabin baggage allowances

**Economy Class:**

One piece of carry-on baggage is permitted with maximum dimensions: 55 x 38 x 20cm (22 x 15 x 8 inches) and maximum weight: 7kg (15lb).

Note: If you're boarding in India, your carry-on baggage may not exceed 115cm or 45.3 inches (length + width + height). If your itinerary originates from Brazil, you're allowed a carry-on weighing 10kg (22lb).

**First Class and Business Class:**

Two pieces of carry-on baggage permitted: one briefcase plus either one handbag or one garment bag. The briefcase may not exceed 45 x 35 x 20cm (18 x 14 x 8 inches); the handbag may not exceed 55 x 38 x 20cm (22 x 15 x 8 inches); the garment bag can be no more than 20cm (8 inches) thick when folded. The weight of each piece must not exceed 7kg (15lb). The total combined weight of both pieces may not be more than 14kg (30lb).

Infants in all cabin classes are permitted one checked-in bag: maximum weight 23kg (50lb) with total dimensions (length + width + height) not exceeding 115cm (45 inches) and one carry-on bag for inflight food and disposable items (weight not to exceed 5kg (11lb) and maximum dimensions: 55 x 38 x 20cm (22 x 15 x 8 inches).





OFFICIAL PREMIER PARTNER

Ticket number: 176 2332393184
Scan the bar code or use the ticket number above at
the self check-in points in the airport.



Ticket number:176 2332393184

Scan the bar code or use the ticket number above at
the self check-in points in the airport.



Explore new worlds

## Inflight entertainment

Fall in love with a classic romance or immerse yourself in
the latest edge-of-the-seat blockbuster - let our ice inflight
entertainment take you to places you won't find on a map.
Choose from over 2,500 channels of movies, TV shows and
music from around the world and in multiple languages. Or
challenge other passengers to a range of gripping games.

© Emirates. All rights reserved    Emirates Experience | Check-in Online | Manage a Booking | Baggage | Contact us

# MyMSK

MSKCC.org | Locations | FAQs | Contact Us | Log Out

| Home | Appointments | Messages | Medical Info | Billing | Forms | | Viewing: |

Profile 👤

## Appointments

Print

**My Appointment(s) on Monday, January 13, 2020**

Return To Appointments

Can't find an appointment?

| Monday, January 13, 2020 | Location | Instruction | |
|---|---|---|---|
| **01:00 PM**<br>Follow Up Visit<br>Robert Tuttle, MD | **MSK 64th Street**<br>205 East 64th Street, Lobby<br>New York, NY 10065 (between Second and Third Avenues)<br>646-888-2716 | Our self-service kiosk is available for check in on the Lobby Level. If you are having blood tests on the day of your physician visit, check-in at Blood Testing on the Concourse Level. | Change |

### Patient Resources

Online   Resources                Counseling & Support        Services for Survivors

Find a Doctor                     Health & Wellbeing           Patient Activities

Patients' Rights  |  Notice of Privacy Practices  |  Terms of Use  |  Contact Us

©2019 Memorial Sloan Kettering Cancer Center: MyMSK (Version# 2.5.8; Server Time: 11/29/2019 6:59:48 PM )

# EXHIBIT B

**UNITED ARAB EMIRATES**
PRESIDENTIAL CAMELS AND
CAMEL RACING AFFAIRS CENTRE
SECTOR OF SCIENTIFIC CENTERS
& PRESIDENTIAL CAMELS



دولــة الإمـارات العــربيـة المتحـدة
مركـز شــؤون الســبــاقات
وهجــن الرئاسـة
قطـاع المراكـز العلميـة
وهجــن الرئاسـة

Date: 04/12/2019

### To Whom It May Concern

 We would like to confirm that our Sector and Dr. Fishman agreed to utilize the benefits of his qualification and experience to work with us  as the Chief Research Officer for Scientific Centers & Presidential Camels, in United Arab Emirates. In that role, Dr. Fishman is responsible for over-seeing several projects for various aspects of the camel industry. Breeding for both food production and their local performance industry is the primary focus of his work.

Dr. Fishman is working closely with several clinicians and scientists that have more than 50 employees whom rely on him, searching in Various zoonotic diseases such as African Sleeping sickness, which is a fatal disease to humans as well are in final testing and early commercialization stages. The breeding season has started and there are many projects underway. The race industry is a non-wagering social welfare system that has over 100,000,000 AED distributed to local Emirates..

We have been informed by Dr. Fishman that he is unable to join our scientists team on December 14, 2019. Indeed, if is not permitted to travel for this limited period of time, there is a risk to loose  his work with us and  terminate his agreement.

Bengawi  A. A.

**Head Of Services And Follow-Up Section**

**Scientific Centers & Presidential Camels**

هاتف : ٠٣-٧٦٨٦٢٧٨ -- فاكس : ٠٣-٧٦٨٦٤٦٤ -- ص.ب : ١٧٢٩٢ -- العين -- الإمارات العربية المتحدة
Tel. : 03-7686278 - Fax : 03-7686464 - P.O. Box : 17292 - Al Ain - United Arab Emirates

EXHIBIT 3



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 5, 2019

<u>**VIA EMAIL & FILED UNDER SEAL**</u>

The Honorable Katharine H. Parker
United States Magistrate Judge
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

    Re: *United States v. Seth Fishman*, **19 Mag. 10120**

Dear Judge Parker:

    The Government writes to oppose the application for permission to travel internationally filed by Seth Fishman, the defendant in the above-captioned matter ("Fishman" or the "defendant"). As explained further below, the defendant has taken steps to set up a life abroad in the United Arab Emirates. His instant request to travel to the U.A.E. poses an unreasonable risk that the defendant will become a fugitive in order to avoid the charges in the above-captioned case. Notably, the defendant's travel request is not motivated by medical necessity, family emergency, or any other exigent circumstance requiring his presence overseas. To the contrary, the defendant seeks to travel abroad to strengthen his foreign ties by continuing the same line of work underlying the current charges: developing misbranded animal drugs. For the reasons outlined below, the defendant's request should be denied.

*Procedural Background*

    The defendant was arrested on or about October 28, 2019 in the Southern District of Florida. That day, the defendant was charged by Complaint in the U.S. District Court for the Southern District of New York with one count of introducing misbranded drugs into interstate commerce with the intent to defraud or mislead, in violation of 21 U.S.C. §§ 331(a), 331(a)(2), 352(o), and 18 U.S.C. § 2. The defendant was presented in the U.S. District Court for the Southern District of Florida on October 29, 2019; several days later, the defendant was released on bail pursuant to an agreed-upon bail package that included, among other conditions, a $100,000 personal surety bond secured by the defendant's residence, travel restricted to the Southern District of Florida, the Southern District of New York and transit points in between, the surrender of any and all travel documents with no new applications, and a prohibition against visiting commercial transportation establishments (*i.e.*, airports) except Brightline and any train line operating solely

within the Southern District of Florida. The defendant was also ordered to appear in this District on November 12, 2019 to be presented on the criminal complaint.

At the defendant's presentment, the Government and the defendant consented to a bail package that largely mirrored the bail package entered into in the U.S. District Court for the Southern District of Florida, with the amended condition that the defendant may utilize local public transportation stations in the Eastern and Southern Districts of New York for purposes of traveling to doctor's appointments, court appearances, and appointments with Pretrial Services.[1]

*Discussion*

This Court should deny the defendant's travel request.  Title 18, United States Code, Section 1342(g) requires the Court to consider whether conditions of release would "reasonably assure" the defendant's appearance in Court.  For the reasons explained below, the agreed-upon bail package—which does not permit the defendant to visit airports, let alone travel overseas— reasonably assures his appearance.  Amending those conditions to grant the defendant's foreign travel request poses a substantial risk of the defendant fleeing to avoid these charges or circumventing the Court's oversight to continue designing, manufacturing, and potentially distributing misbranded products from overseas.

*First*, prior to his arrest, the defendant had taken substantial steps to establish a life abroad in the U.A.E., and over the last several years has spent an increasing amount of time in that country. Notably, the U.A.E. does not have an extradition treaty with the United States.  The defendant was approached, interviewed, and subsequently arrested at Miami International Airport when he was returning from a weeks-long trip to the U.A.E.  In a voluntary, pre-arrest interview made with agents involved in this investigation, the defendant stated that he had suspected he was under investigation and knew he could be arrested.  With that knowledge, and in the months prior to his arrest, the defendant obtained residency status in the U.A.E., opened a foreign bank account in the U.A.E., and obtained an official position in the government of the U.A.E. as Chief Research Officer for the Presidential Camels and Camel Racing Affairs Centre, a government agency.  *See* Def. Ltr. Exhibit B.  Moreover, the defendant has spent increasing amounts of time in the U.A.E. leading up to his arrest.  In 2018, the defendant took 8 trips to the U.A.E. over the course of the year, spending a total of 99 days overseas.  Between January 2019 and the time of the defendant's arrest in October 2019, the defendant had taken 6 multi-week trips to the U.A.E., spending approximately 117 days abroad.  And as illustrated by the defendant's letter, he had intended to spend even more time overseas, having planned to reside in the U.A.E. for approximately five months, from December 2019 through April 2020.  At bottom, the defendant is seeking the Court's permission to return to a country where he has assets, legal residency status, established ties to a foreign government, and no risk of extradition if he chooses to remain abroad.  That combination of factors creates an unreasonable risk of flight.

---

[1] On November 18, 2019, at the defendant's request, the Government applied to the Court for a revision to the defendant's bail conditions, requiring that he refrain from discussing his ongoing criminal case with any person outside the presence of defense counsel in the above-captioned matter, but relieving him of the condition that he avoid any contact with victims of, or witnesses to, the charged crimes without the presence of counsel.

*Second*, the weight of the evidence against the defendant is strong in this case.  The defendant is charged with introducing into interstate commerce misbranded drugs that he manufactured without a license.  There can be no dispute that the defendant did not have a license from the Food and Drug Administration to manufacture drugs.  The Government's evidence that the defendant shipped misbranded products in interstate commerce consists of emails, text messages, and shipping records indicating that the defendant's business consisted of the illegal manufacture and shipment of misbranded animal drugs to customers across the United States, as well as customers located abroad, including in the U.A.E.  Further, upon the defendant's arrest, the Government executed premises search warrants of the defendant's home, office, and storage unit and found large quantities of bottles, packaging and shipping equipment, and electronic devices, which are currently being imaged.  In short, the physical evidence recovered from these searches has further strengthened the already-substantial evidence of the defendant's guilt.  Although, as the defendant notes, the offense charged in this matter has a three-year statutory maximum sentence, the defendant's incentive to flee is nevertheless significant given the strength of the government's case and the likelihood of the defendant's conviction. "Because the evidence of guilt is strong, it provides [the charged defendant] with an incentive to flee." *United States v. Berkun*, 392 F. App'x 901, 903 (2d Cir. 2010); *United States v. Bellomo*, 944 F. Supp. 1160, 1164 (S.D.N.Y. 1996) (denying pretrial release in part because "a defendant facing serious potential penalties in the event of conviction is more likely to disappear if the government's case is strong than if an acquittal appears likely"). The investigation of Dr. Fishman and his illegal drug manufacturing business is ongoing. In the event that the court requires further information regarding that investigation, the Government respectfully requests an opportunity to present such information in camera and ex parte.

As noted above, at the time of his arrest and post-arrest interview, the defendant admitted to the interviewing agents that he recognized that his misbranding activities were wrong. The defendant is also surely aware that the case against him could have collateral consequences for his future employment in the United States, including, most notably, the potential loss of his veterinary license.  The defendant further noted that if law enforcement were to pursue criminal charges against him and others similarly situated to him, it would cripple his ability to earn a livelihood in the United States.  In other words, not only has the defendant conceded his guilt, he has also specifically recognized that the very charges against him may well end his ability to earn a living in the United States. The defendant's recognition of the strength of the evidence against him, coupled with his understanding of the potential impact of this case, dovetail with his specific incentive to flee the United States for a jurisdiction where his illicit practices may be tolerable to local law enforcement.

*Third*, assuming the Court credits the defendant's assertion regarding the scope of his intended activities in the U.A.E.,[2] the defendant's desire to avoid "frustrat[ing]" his relationships

---

[2] The defendant's stated reason for traveling internationally is based on the untenable premise that he may continue his business of designing and manufacturing drugs without a license.  The defendant expects the Government and the Court to rely on his self-serving assertions that his "business" in the U.A.E. will be limited solely to "design[ing] camel specific medications" (which, contrary to his recent practice, will not

with the U.A.E. government, to "continue treating animals," and to "work[] on important projects abroad" do not present compelling circumstances that may otherwise outweigh his risk of non-appearance or assure his return to the United States. For example, the defendant is not seeking lifesaving medical treatment that may only be provided in the U.A.E., thereby justifying a modification to his bail conditions. *Cf. United States v. Scarpa*, 815 F. Supp. 88, 89 (E.D.N.Y. 1993), supplemented (Mar. 5, 1993) (defendant, who had been detained, was ordered released on bail after he had "entered the final stages of [a] fatal illness" so that he could receive "necessary and humane treatment [that could] only [be provided] under care of his physician," and agreed to "be confined to Beekman Hospital under the 24-hour guard of the United States Marshal's Service at [defendant's] own expense"). Nor does the defendant seek permission to travel abroad for a singular and temporally-limited purpose, such as to attend a funeral or a major family event. Instead, the defendant explicitly seeks the Court's permission to travel abroad for the purpose of *strengthening* his ties to the U.A.E. so that he will avoid "terminat[ing] his [employment] agreement" with the U.A.E. government. Given the defendant's letter, it is reasonable to anticipate that he will continue to seek leave of the Court to travel to the U.A.E. pre-trial, further deepening his foreign ties and heightening his risk of flight. Permitting the defendant to travel in order to strengthen his standing and relationships in the U.A.E. would undermine the basis for his pre-trial release. It is self-evident that the Government's consent to the bail package in this matter was premised on the assumption that the defendant would remain within the United States.

*Fourth*, the defendant places great emphasis on his family ties in the United States, including to his elderly father. Nevertheless, the defendant provides no explanation for the fact that, prior to his arrest, he had planned to spend five months away from his family by residing in the U.A.E. between December 2019 and April 2020. Nor does he address the fact that, in 2019, he spent approximately one-third of his time in the U.A.E., undercutting the defendant's arguments on this score.[3]

*Fifth*, the defendant cites a number of out-of-district cases in support of his proposition that foreign travel has been granted to defendants while on pre-trial release. Reliance on any such cases is unfounded without a complete view of the Section 3142(g) factors considered by the

---

be compounded, packaged, and shipped from the United States and, presumably, will not be imported into the United States) and does not provide any evidence to support these assertions. As set forth in the complaint and the defendant's letter, the defendant has, for years, been illegally manufacturing drugs for the purpose of doping animals competing in races and distributing them within the United States and to buyers in the U.A.E., conduct that goes hand in hand with his purported work for the U.A.E. government. In fact, and as indicated in the defendant's letter, the animal products the defendant has illegally manufactured and compounded in the United States may be used on both horses and camels. *See* Def. Ltr. at 2 ("Traditionally, camels have been treated with bovine or equine specific products").

[3] The defense letter cites to *United States v. Esposito*, 309 F.Supp. 2d 24, 32 (S.D.N.Y. 2018) for the unremarkable proposition that risk of flight may be mitigated by "significant family times," and by offering a "family home . . . as a security on a personal recognizance bond." It bears noting that, in *Esposito*, the defendant was not seeking permission to travel abroad, nor were his foreign ties at issue. Rather, in that case, the Government was seeking pre-trial detention, which the defendant opposed. While the Court ultimately ordered the defendant released on bail subject to conditions, the Court required that the defendant surrender all travel documents and hire an armed guard to be stationed outside his home to mitigate the risk of flight. Thus, the facts of *Esposito* are readily distinguishable.

presiding judges in each of those cases prior to granting those defendants' foreign travel requests. In any event, these cases are readily distinguishable on the basis that: (1) the defendant's foreign travel request was not contested, indicating no concern of the defendant's risk of flight; (2) the defendant did not seek to travel abroad to strengthen his foreign ties, as the defendant does here; or (3) the defendant did not otherwise have significant foreign ties. *See* Def. Ltr. at 2 (citing *United States v. Arthur*, No. 10-cr-20753 (S.D. Fla. 2010) (ECF Nos. 109, 141) (foreign travel applications uncontested, no indication of significant foreign ties, no indication that purpose of trip was to deepen foreign ties); *United States v. Vieira*, No. 09-cr-00045 (D.N.J. 2009) (ECF Nos. 111, 265, 307) (foreign travel applications uncontested, defendant sought foreign travel for family celebration and executed an irrevocable waiver of extradition on consent with the Government); *United States v. Brimberg*, No. 13-cr-20570 (S.D. Fla. 2013) (ECF Nos. 33, 34, 35, 36) (defendant sought leave to travel to "visit her terminally ill mother" and the foreign travel application was uncontested; the Court denied the application without prejudice so long as the defendant could strengthen the bail package by "identifying additional sureties and pledging additional property for consideration by the Court"; defendant re-filed a second unopposed application, which was granted)).

The only case cited by the defendant wherein the Government opposed a foreign travel request, *United States v. Snipes*, 06-cr-00022 (M.D. Fla. 2006) (ECF Nos. 20, 509, 512, 520), is inapposite. In that case, the Government agreed—as part of the parties' initial bail package—that the defendant could be released on his own recognizance because he posed no risk of flight. Against that backdrop, the Government consented to the defendant's requests to travel abroad for work purposes on multiple prior occasions before opposing the defendant's request. *See id.* (ECF Nos. 139, 140, 181, 182, 429, 430, 431, 509). Moreover, and as the Court noted in its opinion granting the defendant's contested motion, the defendant had returned to the United States and appeared at all court appearances since the case was charged over two years' prior, which the Court relied upon in determining that "the existing terms and conditions of [the defendant's] release are sufficient to ensure his appearance." (*Id.* ECF No. 520 at 4). Fishman has no such track record of regularly attending court appearances. The Government notes that *Snipes*, decided in the U.S. District Court for the Middle District of Florida, is not binding on this Court and is limited by its unique factual predicate. Most notably, and unlike *Snipes*, the Government has, at the outset of this matter, established bail conditions to mitigate Fishman's risk of flight given his foreign ties and the Government's view that the defendant is a flight risk.

[Continued]

       For all the reasons enumerated above, the Government requests that the Court deny the defendant's motion requesting permission for foreign travel.  The Government further requests that this letter be filed under seal in the above-captioned matter, pursuant to the Court's sealing order.

                          Very truly yours,

                          GEOFFREY S. BERMAN
                          United States Attorney

by:                          
                          Sarah Mortazavi
                          Assistant United States Attorney
                          (212) 637-2520

cc: Andrew Feldman, Esq. (by Email)

EXHIBIT 4

<u>DECLARATION IN SUPPORT OF MOTION</u>

I am Andrew S. Feldman, a licensed attorney admitted to practice law in Florida, New York, DC, and district courts throughout the U.S.

I represent Seth Fishman, DVM in the indicted case of *U.S. v. Navarro,* 20-cr-160 (S.D.N.Y.). I have represented Mr. Fishman since October 28, 2019 last when he was first arrested in this District pursuant to a Criminal Complaint out of the Southern District of New York.   Mr. Fishman was arrested at Miami International airport after he returned from a trip to the United Arab Emirates (UAE).

Shortly after Mr. Fishman was arrested, on November 8, 2019, he met with the agents at the Miramar FBI location for a proffer which lasted 5 hours. During that proffer the agents and Mrs. Mortazavi were advised that many of the seized products were products for overseas customers or were products for camels. Indeed, Mr. Fishman spoke to the agents at length about the nature and scope of his clients in the United Arab Emirates (UAE). During that proffer, Mr. Fishman also explained the origin of certain products and their intended use.

No later than November 15, 2019, I requested that AUSA Sarah Mortazavi provide me with an inventory of the items that were seized from the various locations (house, office, storage unit) searched by law enforcement. In that same email, I further advised that several of the items that were seized by FDA require refrigeration and other conditions to ensure proper maintenance.

On November 21, 2019, after receipt of those inventories, I also advised AUSA Mortazavi via email to return Mr. Fishman's electronic devices, including IPhones, IPads, computers, and laptops.

In or around November 29, 2019 at 3:49 pm EST, I called AUSA Mortazavi on her cell phone.

In or around 7:15 EST pm on December 2, 2019, the undersigned called the USAO. That called included AUSA Bennett Yearney.

During the above phones conferences, I advised the Government that "we had conferred" with an FDA expert on certain regulatory issues and I further conveyed to the Government that, in our view, they had no authority to possess products intended for export to the UAE, including products created by Mr. Fishman for export to UAE. I further communicated to the USAO that they had no extraterritorial jurisdiction to police Mr. Fishman's activities in the UAE and/or the products that

his clients, including foreign officials and royalty, use in the UAE. I also invited the Government to discuss these legal issues with their experts and/or lawyers at the FDA. I advised that, based on these issues it was foreseeable that a motion to return property might be filed in the future if we were not able to come to an agreed resolution. My best recollection is that on the November 29th call, the Government invited me to send them the legal authority or citations I was referring to on the call exempting exports from the misbranding and adulteration provisions of the Food Drug and Cosmetic Act (FDCA).[1] My best recollection is that during the second call with AUSA Mortazavi and AUSA Bennet Yearney that AUSA Mortazavi responded that, even if the products were not misbranded pursuant to 21 U.S.C. Section 381(e), that does not necessarily satisfy the burden or threshold that must be shown during a Rule 41 Motion.

On February 3, 2020, I emailed a *deferred prosecution application* to the USAO and to the supervising AUSAs in this case.[2] A central theme of the application was that Mr. Fishman has transitioned his veterinarian business to international clients during the last 10 years and was willing to limit his veterinarian business to overseas customers only, mostly his international customers in the UAE. In that application, we also underscored again the exports exemption found at 21 U.S.C. Section 381(e) for international clients.

On February 11, 2020, Mr. Fishman sat for a proffer in New York for several hours.

Prior to that proffer, the Government provided via email an MS Excel worksheet to use which is labeled "Inventory House" and lists many of the products that were found at Mr. Fishman's house:



---

[1] On November 29, 2019, I emailed the U.S. Attorney's office a citation to the applicable statute, 21 U.S.C. §381(e). Initially the undersigned sent the wrong citation, 21 U.S.C. Section 831(e)

[2] In the Southern District, a defense lawyer may apply for a deferred prosecution at any time and the application is reviewed by a committee for approval.

During the proffer, Mr. Fishman again explained to the U.S. Attorney's Office (USAO) and the agents that many of the products on their list (attachment from the 2/11/20 email above) are intended for export, are camel products, and/or are not intended for U.S. customers. In fact, during the proffer, the agents and the prosecutors were willing to skip over the products Mr. Fishman identified as "for export."

Following the Indictment in this case, the Government furnished the undersigned with limited discovery including "draft" transcripts of intercepted communications between Mr. Fishman and others. I have reviewed many of those transcripts which date back as far as February of 2019 and occurred during the period of February 2019-in or around October of 2019. Based on my review, it is patently obvious that, during some of the intercepted calls, Mr. Fishman was speaking to UAE clients or international clients.

In sum, at the time of the search, it was foreseeable that the Government would seize certain products intended for Mr. Fishman's international clients and the Government has now been on actual and constructive notice for approximately 6 months that they seized property purchased by or prepared for Mr. Fishman's clients in the UAE.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.


ANDREW S. FELDMAN, ESQ


4/16/2020_____

DATE